[Cite as *Gatsios v. Timken Co.*, 2012-Ohio-2875.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT


|                          |   |                          |
|--------------------------|---|--------------------------|
|                          | : | JUDGES:                  |
| GEORGE GATSIOS           | : | Patricia A. Delaney, P.J.|
|                          | : | John W. Wise, J.         |
| Plaintiff-Appellant      | : | Julie A. Edwards, J.     |
|                          | : |                          |
| -vs-                     | : | Case No. 2011CA00185     |
|                          | : |                          |
|                          | : |                          |
| THE TIMKEN COMPANY       | : | O P I N I O N            |
|                          |   |                          |
| Defendant-Appellee       |   |                          |



CHARACTER OF PROCEEDING:     Civil Appeal from Stark County
Court of Common Pleas Case No.
2010CV00700

JUDGMENT:     Affirmed

DATE OF JUDGMENT ENTRY:     June 25, 2012

APPEARANCES:

For Plaintiff-Appellant          For Defendant-Appellee

DAVID J. STEINER          JILL C. McQUEEN
ANTHONY J. LAZZARO          Day Ketterer Ltd.
The Lazzaro Law Firm, LLC          Millennium Centre – Suite 300
900 Rockefeller Building          200 Market Avenue North
614 W. Superior Avenue          P.O. Box 24213
Cleveland, Ohio 44113          Canton, Ohio 44701-4213

*Edwards, J.*

{¶1} Plaintiff-appellant, George Gatsios, appeals from the July 27, 2011, Judgment Entry of the Stark County Court of Common Pleas granting the Motion for Summary Judgment filed by defendant-appellee The Timken Company.

STATEMENT OF THE FACTS AND CASE

{¶2} Appellant George Gatsios, whose paternal grandparents were from Greece, was first employed by appellee The Timken Company in 1997 as a janitor at the Wooster plant. After he was laid off, he was recalled to active employment and worked at the Canton plant in the Thermal Treat Department as a furnace attendant. As a furnace attendant, he was responsible for operating a crane, loading and unloading furnaces and making sample cuts.

{¶3} At the Canton plant, appellant was supervised first by Larry Barrich who had to counsel him about work performance problems. After Barrich retired, Dan Smith replaced Barrich as appellant's supervisor. Smith had to issue verbal warnings to appellant. Appellant testified that he knew that there was a difference between counseling and formal disciplinary action. In 2000, appellant was given a written warning for insubordination and on June 29, 2005, Smith gave appellant a strong counsel for improper job performance. Appellant also was counseled in July of 2005 by Smith about job performance and received an oral warning from Smith in December of 2005.

{¶4} In 2006, Jerry Williams, who was brought back from retirement, became appellant's supervisor. Appellant, during his deposition, testified that, prior to working with Williams, he had heard that Williams was very hard to work for and was "very

pushy, arrogant, and judgmental." Appellant's Deposition Transcript at 38. According to appellant, he had a problem with Williams within the first three minutes after Williams became his supervisor when Williams told appellant and his operator, Mike Lovejoy, that he was not happy unless he was making someone else miserable.

{¶5} Appellant testified that he disagreed with Williams' methods, but that he never argued with Williams or verbally disagreed with him.

{¶6} Appellant worked under Williams from July 2006 until December of 2006. According to appellant, early in his tenure, Williams told appellant that he was surprised that appellant had a girlfriend because appellant was Greek. Appellant testified that Mike Lovejoy was present when such comment was made. Williams, halfway through his tenure, also indicated to appellant that he could not believe that appellant had children because appellant was Greek. Appellant testified that Williams "was insinuating that I was gay." Appellant's Deposition Transcript at 46. Appellant also testified that Williams told Mike Lovejoy in front of appellant that he would not be "caught dead" in the same dressing room or locker room as appellant. Id. The following is an excerpt from appellant's deposition testimony:

{¶7} "Q. Are there any other occasions on which you say Mr. Williams abused you verbally or made derogatory comments about your heritage?

{¶8} "A. Inadvertently, yes.

{¶9} "Q. Tell me what you mean by that.

{¶10} "A. Inadvertently, he had also made the statement, we were out on the floor, me, Mike [Lovejoy] and Mr. Williams, Mike was writing something down and

dropped his pen. Well, Mike had bent over to pick up his pen, and Jerry told Mike that 'I wouldn't bend over in front of George like that.'

{¶11} "Q. What about that comment makes you believe it is related in any way to your heritage?

{¶12} "A. Basically he was referring to gay sex. Me having gay sex with Mike.

{¶13} "Q. That is an inference that you drew from that comment?

{¶14} "A. Most definitely.

{¶15} "Q. Did you give Mr. Williams any reason to suppose you might be - - excuse me - - to suppose you might be gay?

{¶16} "A. I don't believe he liked my long hair." Appellant's Deposition at 49. Appellant testified that he was not gay.

{¶17} On half a dozen occasions, Williams threatened appellant and other employees with termination if they did not perform a duty. In December of 2006, Williams threatened four employees with possible termination. Appellant testified that he had heard that Williams, on the first day of his tenure, told an employee that the employee would be wearing a paper hat and working under the golden arches. According to appellant, while Williams treated other employees similarly in terms of verbal abuse and threats of termination, appellant was "the main whipping post." Appellant's Deposition at 55.

{¶18} On or about December 26, 2006, appellant took a medical leave of absence for nerves. Appellant testified that his leave was the result of an incident on December 23, 2006, during which appellant, Jim Haven, Doug Hoffman and Harvey Guilliouma were present. According to appellant, the four were on their lunch break

when Williams "burst into the room, started cussing, ranting, raving, threatening" and told them to get off their "lazy asses" and back to work. Appellant's Deposition at 78-79. Williams told all of the employees that he would have them in his office tomorrow and threatened to get them fired. Williams, according to appellant, also told them to put down the pornography. Appellant testified that no one was looking at pornography at the time, although he admitted that he had had pornographic materials at work in the past. While both Hoffman and Guilliouma immediately went back to work, appellant told Williams that he was on his lunch break and was not going anywhere and that Williams was "pushing his luck." Appellant testified that Williams started belittling him. Appellant's Deposition at 89. Appellant then finished his lunch and was not disciplined.

{¶19} Appellant returned to work on April 17, 2007. As of April of 2007, Williams was no longer his supervisor. Appellant worked for only about two weeks and learned that Williams would be returning to appellant's department, but that Williams would not be supervising appellant's crew. Appellant then took another medical leave of absence because Williams' presence was threatening to him.

{¶20} In October of 2007, appellant filed a charge of discrimination with the Equal Employment Opportunity Commission [EEOC], citing to the December 23, 2006 incident. Appellant, in his charge, alleged that Williams had screamed, hollered and used profanity against him and three other employees who were on a lunch break and that Williams "has a history of using verbal harassment toward employees during his long tenure with Timken Co." The charge was dismissed by the EEOC on or about December 13, 2007. Appellant also initiated a grievance with the help of his union representative on or about December of 2007 alleging that supervision had created a

hostile, intimidating and harassing work environment and that he had been singled out by Williams. After an investigation by appellee, appellant's grievance was denied.

{¶21} Appellant remained off of work from May 1, 2007 through January 7, 2008 because he was "sick." Appellant's Deposition Transcript at 72. Appellant returned to work in January of 2008 after learning that Williams was no longer there. At the time, appellant's supervisor was Christy Haubert. In July of 2008, when the workload in appellant's department was high, appellant did not cut any product samples at all on July 6, 2008, and July 7, 2008, and was spoken to by Haubert. Appellant, who testified that he previously had always had help, complained to Haubert that he had too much work, and had no one to help him. Appellant was not formally disciplined, but had a psychological breakdown as a result of Haubert's criticism of him and reported off of work on July 26, 2008. Appellant has not returned to work since such time.

{¶22} In November of 2008, appellant filed a second grievance alleging that he had been retaliated against for filing a complaint against Williams. Appellant alleged that appellee had retaliated against him by failing to provide him with adequate assistance and that he was wrongfully disciplined again in June and July of 2008. Appellant also alleged that he was the victim of ancestry based harassment from Williams. This grievance was investigated and denied.

{¶23} On February 17, 2010, appellant filed a complaint against appellee, alleging that he had been harassed by Williams based on his Greek ancestry in 2006, and had been retaliated against in 2008, for complaining about the harassment. Appellee filed a Motion for Summary Judgment. Pursuant to a Judgment Entry filed on July 27, 2011, the trial court granted such motion.

**{¶24}** Appellant now raises the following assignments of error on appeal:

**{¶25}** "I. THE TRIAL COURT ERRED IN GRANTING APPELLEE'S MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO APPELLANT'S CLAIM OF HOSTILE ENVIRONMENT WORKPLACE ANCESTRY HARASSMENT.

**{¶26}** "II. THE TRIAL COURT ERRED IN GRANTING APPELLEE'S MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO APPELLANT'S CLAIM OF RETALIATION."

STANDARD OF REVIEW

**{¶27}** Summary Judgment motions are to be resolved in light of the dictates of Civ.R. 56. Said rule was reaffirmed by the Supreme Court of Ohio in *State ex rel. Zimmerman v. Tompkins*, 75 Ohio St.3d 447, 448, 1996–Ohio–211, 663 N.E.2d 639:

**{¶28}** "Civ.R. 56(C) provides that before summary judgment may be granted, it must be determined that (1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made. State ex rel. *Parsons v. Fleming* (1994), 68 Ohio St.3d 509, 511, 628 N.E.2d 1377, 1379, citing T*emple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O3d 466, 472, 364 N.E.2d 267, 274."

**{¶29}** As an appellate court reviewing summary judgment motions, we must stand in the shoes of the trial court and review summary judgments on the same

standard and evidence as the trial court. *Smiddy v. The Wedding Party, Inc*, 30 Ohio St.3d 35, 506 N.E.2d 212 (1987).

**{¶30}** It is pursuant to this standard that we review appellant's assignments of error.

I

**{¶31}** Appellant, in his first assignment of error, argues that the trial court erred in granting summary judgment in favor of appellee on appellant's hostile environment ancestry harassment claim.

**{¶32}** As is stated above, appellant has alleged that he experienced workplace harassment based on his Greek ancestry. R.C. 4112.02(A) states that "[i]t shall be an unlawful discriminatory practice: (A) For any employer, because of the race, color, religion, sex, national origin, handicap, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."

**{¶33}** The Ohio Supreme Court has held that federal case law interpreting Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000 et seq. is generally applicable to cases involving alleged violations of R.C. Chapter 4112. *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.*, 66 Ohio St.2d 192, 196, 421 N.E.2d 128 (1981). Thus, we may consider federal case law in analyzing cases of discrimination.

**{¶34}** In order to establish a claim of hostile-environment ancestry harassment, the plaintiff must show (1) that the harassment was unwelcome, (2) that the harassment

was based on appellant's ancestry, (3) that the harassing conduct was sufficiently severe or pervasive to affect the "terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment," and (4) that either (a) the harassment was committed by a supervisor, or (b) the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action. See *Hampel v. Food Ingredient Specialties, Inc.* 89 Ohio St.3d 169, 2000-Ohio-128, 729 N.E.2d 726.

{¶35} To state a claim for hostile work environment harassment, appellant must show that he was subject to a workplace "permeated with 'discriminatory intimidation, ridicule, and insult.' " *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993), quoting *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986); *Edwards v. Wallace Community College,* 49 F.3d 1517, 1521 (11th Cir.1995). Appellant must show that the discriminatory atmosphere was "sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Harris,* 510 U.S. at 21, 114 S.Ct. at 371, quoting *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405; *Edwards,* 49 F.3d at 1521.

{¶36} In order to be actionable, a hostile work environment "'must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" *Bell v. Cuyahoga Community College*, 129 Ohio App.3d 461, 467, 717 N.E.2d 1189 (8th Dist. 1998), citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

In *Faragher,* supra at 786, quoting *Harris,* supra at 371, the Ohio Supreme Court stated as follows:

{¶37} "We directed courts to determine whether an environment is sufficiently hostile and abusive by 'looking at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'

{¶38} * *

{¶39} "We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment * * *."

{¶40} As noted by the court in *Torres v. County of Oakland*, 758 F.2d 147, 152 (6th Cir. 1985) "While a continuing use of racial or ethnic slurs would violate Title VII, occasional or sporadic instances of such conduct does not. *See Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1257 (8th Cir.1981); *Cariddi v. Kansas City Chiefs Football Club, Inc.,* 568 F.2d 87, 88 (8th Cir.1977). *Cf. Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir.1982) (to violate Title VII, sexual harassment 'must be sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment'). "

{¶41} In the case sub judice, we concur with the trial court that appellant met the first element of a claim for hostile environment ancestry harassment. Appellant put forth evidence that Jerry Williams harassed him on a regular basis and that such harassment was unwelcome by appellant. Appellant, in his deposition testimony and in his affidavit,

indicated that Williams called him stupid, crazy, told him that he needed to have his head examined and made derogatory comments about appellant's appearance.

{¶42} However, we find that appellant has failed to establish that reasonable minds could conclude the harassment was based on ancestry. Appellant has failed to show that his Greek ancestry was the motivating reason behind Williams' behavior. See *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 707 (6th Cir. 2007). Appellant, both in his deposition testimony and in the affidavits filed with the trial court, cites to five comments made by Williams during the period from August to September of 2006. The comments that appellant cites to are as follows: (1) Williams stated that he was surprised that appellant had a girlfriend because he was Greek, (2) Williams indicated that he could not believe that appellant had children because he was Greek, (3) Williams stated that he knew how Greek guys were, (4) Williams stated he that would not be caught dead sharing a locker room or dressing room with appellant, and (5) Williams stated that he would not bend over in front of appellant.

{¶43} As noted by the trial court, considering the totality of the circumstances, "those comments are not sufficient for reasonable minds to conclude that the majority of Williams' harassing conduct towards [appellant] was motivated by his Greek ancestry." While appellant contends that Williams singled him out because of his Greek ancestry, we note that there was extensive testimony that Williams was verbally abusive to the other employees on his crew who were not Greek, was pushy and difficult to work with and was condescending. Appellant himself testified that Williams threatened to have employees removed or fired. As is stated above, appellant testified that Williams told another employee that he would be working under the golden arches and told another

to get off his "fat ass."  During his deposition, appellant testified that Williams, in terms of verbal abuse and threats of termination, treated other employees similarly and that Williams told employees that he was not happy unless he was making someone's life miserable.  Appellant, also produced evidence that Williams told Mike Lovejoy, who is not Greek, that he hoped that Lovejoy had a heat stroke and would get cancer and die, and that Williams called employees names and told one, William Patrick, to get off his "fat ass."

**{¶44}** Moreover, as noted by the trial court, there was evidence that appellant's workplace behavior and his work performance explained his being singled out by Williams. Appellant, during his deposition, testified that he rolled up his coveralls despite working with hot furnaces, put foreign objects in his hair (including hair ties, pens and a fork), wore his hair in pigtails and sang while he worked.  Appellant himself admitted that he believed that Williams disapproved of him because of his long hair.  While he denied having pornography on December 23, 2006, he admitted that he had brought pornography to work in the past.  Moreover, appellant, when asked whether, during working hours, he had discussed his use of the services of a prostitute with a co-worker, admitted that he had. Appellant also told Williams that he was "pushing his luck" when Williams told appellant, who was on a break, to get back to work. As is stated above, while the other employees went back to work as directed, appellant did not.  Even before Williams was his supervisor, appellant harbored hard feeling towards him. During his deposition, appellant testified that before Williams arrived, he sarcastically wrote "Welcome, Jerry Williams. We love you" on his daily crane operating checklist because

Williams' reputation preceded him and Williams was not a good addition to the crew. On another occasions, appellant referred to Williams as a "snake."

{¶45} In addition to the above, there was evidence that appellant himself regularly insulted co-workers and/or supervisors.  Appellant testified during his deposition that he made fun of co-workers about their sexual identity or orientation and weight. Appellant also referred to another employee as "the hit man". Appellant, on his crane safety checklist, which is an official work form, indicated that one employee had tried to give him a "gay lap dance." Appellant's Deposition at 181.  On July 11, 2006, appellant recorded information on a checklist that "Fat guy called Heckathorn an Ewok." Id at 175. Appellant also recorded on other occasions that an employee needed a "retard strap", which is a crane belt, and that his ex-wife was an "F-N Chinese." Appellant's Deposition at 162 and 167. Appellant also made jokes about homosexuality and referred to one employee as the "Iraqi" because he was a veteran. Appellant's Deposition at 156.  Appellant also commented about Williams' religious beliefs. Williams is Jewish.  Moreover, appellant also challenged Williams' authority at times.

{¶46} In addition to finding that Williams' alleged harassment of appellant was not motivated by ancestry, we find that appellant cannot establish that the alleged ancestry harassment was severe or pervasive.  A hostile work environment violative of federal and state law is one that is permeated "with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." See *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.E.2d 295 (1993) (internal quotation marks and citation omitted).

{¶47} As is stated above, appellant testified that Williams made five comments that appellant believed were in reference to his Greek heritage. These comments occurred between August and December of 2006, which is a short period of time. While the statements may have been inappropriate, they constitute off-hand, isolated comments occurring over a brief period of time, which failed to alter any term or condition of appellant's employment. See *Burnette v. Tyco*, 203 F.3d 980 (6 Cir. 2000) (manager's multiple comments over six months and unwelcome reaching inside employee's blouse was not severe and pervasive enough to constitute sexual harassment); *Powers v. Ferro Corp.*, 8th Dist. No. 79383, 2002-Ohio-2612 (summary judgment appropriate where conduct consisted of commenting on female co-worker's breasts and showing her a questionnaire with explicit sexual conduct). There is no evidence that Williams touched or harmed appellant physically.  This is not a situation where appellant's work environment was permeated "with discriminatory intimidation, ridicule, and insult."

{¶48} While, as is stated above, appellant cites to numerous instances where he was ridiculed or verbally assaulted by Williams, as is stated above, there was evidence that William's treated other employees, who were not Greek in a similar, manner.

{¶49} We further find that appellant did not satisfy the subjective requirement for hostile work environment claims. Appellant testified that he never complied with appellee's handbook policy on reporting harassment or discrimination.  Appellant did not formally complain about Williams' behavior until October of 2007 and at that time did not raise the issue of harassment based on ancestry.  Rather, at such time, appellant alleged that Williams verbally abused, harassed and bullied him and other employees

and cited to the December 2006 incident. Appellant, during his deposition, testified that, while he was working under Williams, he did not suspect that Williams' remarks were based on his Greek ancestry until "one of the union reps asked me if he had ever made any comments about my heritage many months after the fact…" Appellant's Deposition at 449-450. Appellant did not raise the issue of ancestry harassment until he filed his grievance in December of 2007. As noted by the trial court, "no ancestry based discrimination was evident to [appellant] until nearly two years after the statements in question,…" Based on the foregoing, appellant has failed to establish that the conduct was, on a subjective basis, offensive.

{¶50} We further find that appellant has failed to establish the objective requirement for hostile environment harassment claims. As is discussed above, appellant himself engaged in offensive conduct and made offensive comments about his co-workers in terms of sexual orientation, religion, and/or weight. On his crane operating checklists, appellant used offensive language and obscene descriptions of co-workers. In other words, a reasonable person would find that the communications in the work environment sub judice, though crude, were typical of this work environment.

{¶51} In short, we find that appellant has failed to prove all of the elements to establish his claim for hostile environment ancestry harassment. While supervisor Williams may have treated appellant in an offensive manner, and on occasion referenced appellant's Greek heritage as part of that offensive treatment, the evidence does not show that Williams, who generally treated employees in an offensive manner, singled out the appellant for offensive treatment based on appellant's Greek ancestry.

**{¶52}** Based on the foregoing, we find that the trial court did not err in granting summary judgment in favor of appellant on his hostile work environment ancestry claim.

**{¶53}** Appellant's first assignment of error is, therefore, overruled.

II

**{¶54}** Appellant, in his second assignment of error, contends that the trial court erred in granting summary judgment in favor of appellee on appellant's claim that he was retaliated against for filing a discrimination charge with the EEOC on October 17, 2007 and for filing a union grievance on December 11, 2007, relating to the alleged discrimination and hostile environment created by Williams.

**{¶55}** To prove a prima facie case of retaliation under Title VII or R.C. 4112.01 et seq., a plaintiff must demonstrate that (1) she engaged in a protected activity; (2) her employer knew about the protected activity; (3) her employer took adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *Canitia v. Yellow Freight Sys.*, 903 F.2d 1064, 1066 (C.A. 6 1990); *Wille v. Hunkar Lab., Inc.,* 132 Ohio App.3d 92, 107–108, 724 N.E.2d 492, (1st Dist. 1998).

**{¶56}** Once a plaintiff establishes a prima facie case, the burden then shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for its actions. *McDonnell Douglas v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.E.2d 668 (1973). If the employer satisfies this burden, the burden shifts back to the complainant to demonstrate "that the proffered reason was not the true reason for the employment decision." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981).

**{¶57}** There is no dispute that the first two elements are met. Appellant clearly engaged in protected activity and appellee was aware of the same.

**{¶58}** The next issue for determination is whether or not appellee took adverse action against appellant. As a general rule, adverse employment actions must materially affect the plaintiff's terms and conditions of employment resulting in a job-related detriment. *Peterson v. Buckeye Steel Casings*, 133 Ohio App.3d 715, 727, 729 N.E.2d 813 (10th Dist. 1999). Examples of such actions include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities[.]" *Peterson,* supra, at 727, citing *Crady v. Liberty Natl. Bank & Trust Co.,* 993 F.2d 132, 136 (C.A. 7 1993).

**{¶59}** Appellant maintains that he was retaliated against because, during the period from May 15, 2008, until July of 2008, he was not provided with adequate help to do his job after a co-worker, Doug Hoffman, moved to another department. Appellant claims that he requested help due to a high workload, but was denied the same and that three other furnace attendants received the necessary help during this period. Appellant contends he was retaliated against when, in June of 2008, he received a written warning for an improper mix.  Finally, appellant also contends that he was retaliated against when he was later spoken to in July of 2008 by his supervisor, Christy Haubert, for failing to make sample cuts.  According to appellant, "[a]ll of this discipline….was administered to appellant after appellee set him up for failure by not providing him the help that they had provided in the past…."

{¶60} Appellant, in support of his contention, cites to the following language from his affidavit:

{¶61} "Management had several options to provide me the requested and required help that I needed during this period. They could have assigned our crews Special Tender (who floats from job to job as needed), requested a person from the labor gang, hired summer help, posted overtime, or hired someone.

{¶62} "The other three furnace attendants (like myself) received the necessary help during this period**. The only difference between the other attendants and myself is that I had reported discrimination and harassment by a supervisor and they had not.** (Ex. 1, Gatsios Aff ¶ 15)."

{¶63} Appellant also cites to the following language contained in the affidavit of his co-worker, Douglas Hoffman:

{¶64} "7. After Mr. Williams was removed from our department and George came back to work, it seemed like Timken did not provide George with the help it used to provide him in assisting him with his job. For example, George was responsible for cutting samples of steel for which he had a quota. **He would be disciplined if he did not meet his quota, but his quota was nearly impossible to meet without assistance from other employees.** Before Mr. Williams left our department, George routinely received assistance in performing his job. **I found it suspicious that Timken stopped providing him with the assistance he needed to do this job when he returned after Mr. Williams' departure.**

{¶65} "8. For example, part of George's job included operating an overhead crane. He was often responsible for moving 40,000 pounds of hot steel. His job

involved a high level of danger to himself and for others around him. Not providing him with the proper help to do his job is a serious matter and would cause a great deal of stress and anxiety for most people in George's position. **In fact, I thought that they (sic) way the company failed to provide him with help after his return to work was pretty ridiculous.** (Ex. 3, Hoffman Aff.)."

**{¶66}** There is no evidence that appellant was terminated, demoted or reassigned with different responsibilities. While appellant argues that appellee retaliated against him by denying him help, during his deposition, he testified that Doug Hoffman, who had been his part-time help, transferred out of the department of his own accord a couple of months after appellant returned to work in 2008. Thus, the lack of help was not caused by appellee. Appellant testified that he did not believe that Hoffman was retaliating against him by transferring and that he was told by appellee that it did not have a body to give me." Appellant's Deposition at 294. Appellant testified that he did not believe that explanation, but when asked during his deposition whether he had any evidence supporting his belief, appellant testified that "[o]ther than the act, no." Appellant's Deposition at 294.

**{¶67}** Appellant, in support of his allegation that he was retaliated against, also testified that he was unjustifiably criticized by Christy Haubert in July of 2008 and told that he was not doing his job. He testified that he could only do so much with no help. Appellant admitted during his deposition that he had been criticized by a supervisor prior to July 4, 2008, for the way in which he did his job. The following is an excerpt from appellant's deposition testimony:

**{¶68}** "Q. I understand that.  My question for you is: Can you tell me specifically what makes you believe that there is any connection with what Christy Haubert spoke to you about in July of 2008 and the fact that you had filed that complaint against Jerry Williams in 2007?  What evidence do you have, if any, that the two things are in any way connected?

**{¶69}** "A. I don't have any direct evidence.

**{¶70}** "Q. Do you have any indirect evidence?

**{¶71}** "A. Other than the act itself of not giving me help, no.

**{¶72}** "Q. Now, I want to ask you this.  And this is a very specific question.  Did you receive any formal discipline from Christy Haubert in July of 2008 in connection with your job performance?

**{¶73}** "A. Formal as in written form?

**{¶74}** "Q. Disciplinary action?

**{¶75}** "A. Disciplinary action on the 4th, we had a conversation.  It was verbal.  It wasn't written where I explained to her in detail the situation."  Appellant's Deposition at 302.

**{¶76}** Appellant also testified that he did not receive any formal written discipline in July of 2008, but indicated that he believed that any time a supervisor spoke with him about his job performance, it was disciplinary action. Appellant testified that he did not receive time off without pay and was not fired. Appellant also testified that Christy Haubert spoke with him about two shifts in July of 2008 during which appellant made no cuts. Appellant admitted that he told Haubert on July 7, 2008 that he had not made any cuts because he was "not into it" and that he did not receive any written discipline as a

result, but rather discussed the issue at length with Haubert. While appellant testified that he considered "counseling" by a supervisor a form of discipline, he admitted that he was told by appellee's representative that his conversation with Haubert was not discipline and that he had not been reprimanded. In short, as noted by the trial court, "[b]esides the alleged informal chastisement he received from his supervisor, [appellant] did not receive any further disciplinary action."

{¶77} Finally, appellant argues that he was disciplined for product mixes in June of 2008, and that such discipline was retaliatory. However, we note that appellant, during his deposition, testified that in July of 2005, Dan Smith disciplined him for product mixes. Appellant testified that discipline for product mixes was not unusual.

{¶78} Based on the foregoing, we find that the trial court did not err in granting summary judgment in favor of appellee on appellant's retaliation claim because there was no evidence that appellee took adverse employment action against appellant.

**{¶79}** Appellant's second assignment of error, is, therefore, overruled.

**{¶80}** Accordingly, the judgment of the Stark County Court of Common Pleas is affirmed.


By: Edwards, J.

Delaney, P.J. and

Wise, J. concur

_____

_____

_____

JUDGES

JAE/d0320

[Cite as *Gatsios v. Timken Co.*, 2012-Ohio-2875.]

IN THE COURT OF APPEALS FOR STARK COUNTY, OHIO

FIFTH APPELLATE DISTRICT

GEORGE GATSIOS                           :
                                         :
                Plaintiff-Appellant      :
                                         :
                                         :
-vs-                                     :        JUDGMENT ENTRY
                                         :
THE TIMKEN COMPANY                       :
                                         :
                Defendant-Appellee       :        CASE NO. 2011CA00185


    For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Stark County Court of Common Pleas is affirmed.  Costs assessed to appellant.


                                              _____


                                              _____


                                              _____

                                                    JUDGES